IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
NORTHERN DIVISION

No. 2:14-CV-00053-F

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| BERTIE AMBULANCE SERVICE, INC., | ) | |
| et al., | ) | |
| Defendants. | ) | |

This matter is before the court on a Motion for Summary Judgment [DE-25] filed by

Defendants Bertie Ambulance Service, Inc., Edward L. Lipscomb, and Annetta P. Lipscomb. The

Government has responded [DE-31] and Defendants have replied [DE-33]. The matter is now ripe for

disposition. For the reasons stated below, Defendants' motion is ALLOWED in part and DENIED in

part.

## I. FACTUAL AND PROCEDURAL HISTORY

The Government brings claims against Defendants Edward L. Lipscomb, Annetta P.

Lipscomb, and Bertie Ambulance Service, Inc. (hereafter "Bertie"), alleging that Defendants

repeatedly submitted claims for payment to which they were not entitled in violation of the False

Claims Act (hereafter "the FCA"). *See* Compl. [DE-1] ¶ 1. The Government alleges that Defendants'

submission of false claims was a pattern of behavior spanning several years and resulting in millions

of dollars of improper payments by the United States. *See* Resp. [DE-31] at 13 n.6; Compl. [DE-1]

¶¶ 49, 52–55.

The Lipscombs are co-owners of Bertie, an ambulance transportation service providing emergency and non-emergency transport to patients in multiple eastern North Carolina counties. Mem. Summ. J. [DE-26] at 2. Bertie, in operation since 1996, has its principal office in Windsor, North Carolina, with additional offices in Roanoke Rapids, Henderson, and Belhaven. *Id.* Over the years, the Lipscombs have increasingly delegated day-to-day operations of Bertie to upper-level management. Resp. [DE-31] at 10; Mem. Summ. J. [DE-26] at 3.

In addition to providing emergency transport services, Bertie transported End Stage Renal Disease patients to non-emergency, scheduled dialysis treatments. Mem. Summ. J. [DE-26] at 3. Many of these dialysis patients were on Medicare, which would reimburse Bertie for the cost of the transport, provided that transport by ambulance was medically necessary. *Id.* For payment, Bertie was required to document medical necessity through Physician Certification Statements (hereafter "PCS") and Ambulance Call Reports (hereafter "ACR"). *Id.* A PCS contains the treating doctor's certification that ambulance transport is medically necessary, while an ACR "describes the ambulance's origin, destination, reason for transport, and reason why stretcher transport is medically necessary." *Id.* at 4. ACRs are completed by the emergency medical technician (hereafter "EMT") who transports the patient. *Id.*

From 1999 to 2011, Bertie contracted with a billing company, EMS Management and Consultants (hereafter "EMS Management") to file claims on Bertie's behalf. Resp. [DE-31] at 5; Mem. Summ. J. [DE-26] at 5. EMS Management conducted numerous training sessions over the years on proper assessment and documentation of medical necessity. Resp. [DE-31] at 5; Mem. Summ. J. [DE-26] at 5. According to Defendants, Bertie "employs multiple levels of oversight to ensure that their documentation obligations are met and that only patients meeting medical necessity are transported." Mem. Summ. J. [DE-26] at 4. In addition to the training from EMS Management,

EMTs receive instruction from their supervisors and from other, more experienced EMTs. *Id.* Ms. Lindsey and Ms. Hughes, managers for the Windsor and Roanoke Rapids offices, respectively, review documentation and provide quality control. *Id.* The Government contends, however, that Bertie regularly submitted reimbursement claims for dialysis patients who did not meet the requirements for medical necessity, and that Bertie management and the Lipscombs were aware that improper claims were being submitted. Compl. [DE-1] ¶ 38. Further, the Government alleges that Bertie trained its EMTs to complete ACRs in a way that would ensure payment for the company, despite the patients' lack of medical necessity. Resp. [DE-31] at 8.

The Government began investigating Bertie in 2004. Mem. Summ. J. [DE-26] at 7. On November 24, 2010, Agent Andrew LeFaivre requested that AdvanceMed Corporation, the Medicare ZoneProgram Integrity Contractor for North Carolina, create a statistically valid random sample of thirty claims for twenty-one dialysis patients from 2005 to 2010. Def. Ex. I, DHHS Req. [DE-25-9]. These claims were then reviewed by three experts (two retained by the Government and one by Defendants) for medical necessity. The first Government expert, Shea Chappell, reported that all of the claims she reviewed lacked either medical necessity or adequate documentation of medical necessity, and that valid signed PCS forms were missing from forty-six percent of the claims. Resp. [DE-31] at 4; Gov't Ex. C, Chappell Report [DE-31-4]. The Government's other expert, Dr. Nabil El Sanadi reported that thirty-three percent of the sample claims lacked medical necessity and twenty percent lacked adequate documentation. Resp. [DE-31] at 4; Gov't Ex. D, El Sanadi Report [DE-31-5]. Defendants' expert, Dr. Leon Dantzler, found that twenty-six percent of the sample claims failed to meet medical necessity requirements. Resp. [DE-31] at 4; Gov't Ex. E, Dantzler Report [DE-31-6].

On August 31, 2010, Assistant United States Attorney Neal Fowler wrote to Bertie, notifying the company that it was being investigated with regard to allegations of false claims for Medicare and

Medicaid payments. Def. Ex. A, Fowler Letter [DE-27-1]. AUSA Fowler requested that Bertie consent to toll the six-year statute of limitations "to allow the parties adequate time to discuss these matters and work toward settlement prior to filing a civil case." *Id.* Bertie agreed, and the parties entered into a series of four Tolling Agreements, for periods from September 1, 2010, to August 29, 2014. Resp. [DE-31] at 12. Each Tolling Agreement provided that Bertie would waive its statute of limitations defenses as to any claims filed by the Government. *See* Def. Ex. B, 2010 Tolling Agreement [DE-27-2]; Def. Ex. C, 2011 Tolling Agreement [DE-27-3]; Def. Ex. D, 2012 Tolling Agreement [DE-27-4]; Def. Ex. E, 2013 Tolling Agreement [DE-27-5]. In exchange, the Government agreed "to provide thirty (30) days notice to the prospective defendants before the United States files any action alleging the Government claims." 2010 Tolling Agreement [DE-27-2]; 2011 Tolling Agreement [DE-27-3]; 2012 Tolling Agreement [DE-27-4]; 2013 Tolling Agreement [DE-27-5]. On August 28, 2014, the day before the 2013 Tolling Agreement was set to expire, the Government filed its complaint. *See* Compl. [DE-1]. The parties disagree about whether the Government notified Bertie of its intention to file suit. Defendants filed the instant motion [DE-25] on June 30, 2015.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 247 (1986). The movant bears the initial burden of coming forward and demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When making the summary judgment determination, the court views the facts and all reasonable inferences in the light most favorable to the non-movant. *Liberty Lobby*, 477 U.S. at 255. Once the moving party has met its burden, the non-moving party then must come forward and demonstrate that such a

4

fact issue does indeed exist. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment is appropriate against a party who fails to make a showing sufficient to establish any one of the essential elements of the party's claim on which he will bear the burden of proof at trial. *See Celotex*, 477 U.S. at 322–23. Thus, "where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," the court may grant summary judgment. *Teamsters Joint Council No. 83 v. Centra, Inc.*, 947 F.2d 115, 119 (4th Cir. 1991).

## III.    ANALYSIS

The FCA prohibits, among other things, "knowingly present[ing], or caus[ing] to be presented, a false or fraudulent claim for payment or approval" to the United States Government; "knowingly mak[ing], us[ing], or caus[ing] to be made or used, a false record or statement material to a false or fraudulent claim;" or "conspir[ing] to commit a violation of [the FCA]." 31 U.S.C. § 3729(a)(1)(A)–(C). The Government asserts that Defendants, between 2005 and 2010, repeatedly violated the FCA by submitting claims for Medicare and Medicaid reimbursement for ambulance transport services that "were not medically necessary, were not supported by a valid Physician Certification Statement, or otherwise did not qualify for reimbursement." Compl. [DE-1] ¶¶ 57, 60, 63. The Government further alleges that Defendants conspired together to commit their violations of the FCA. *Id.* ¶ 63.

In support of summary judgment, Defendants argue: (1) that all claims against Defendants Edward Lipscomb and Annetta Lipscomb arising prior to August 28, 2008, are time-barred by the six-year FCA statute of limitations, Mem. Summ. J. [DE-26] at 14–16; (2) that the Government's claims against all Defendants fail as a matter of law because the Government has forecast insufficient evidence of Defendants' knowledge of FCA violations—an essential element of an FCA claim, *id.* at 20–25; (3) that claims against Bertie arising prior to August 28, 2008, are time-barred, *id.* at 19–20;

5

and (4) that a conspiracy cannot be had between a corporation and its officers, *id.* at 13–14. The Government concedes the first and fourth points. *See* Resp. [DE-31] at 2 n.1. The court will discuss Defendants' second and third arguments in turn.

## A. Scienter Requirement

A defendant is liable for a violation of the FCA if he has actual knowledge of, deliberate ignorance of, or reckless disregard for the truth or falsity of claims submitted to the Government. 31 U.S.C. § 3729(b)(1). Thus, the scienter requirement under the FCA precludes punishment of "honest mistakes or incorrect claims submitted through mere negligence." *United States ex rel. Owens v. First Kuwaiti Gen. Trading & Contracting Co.*, 612 F.3d 724, 728 (4th Cir. 2010) (quoting *United States ex rel. Hochman v. Nackman*, 145 F.3d 1069, 1073 (9th Cir. 1998)).

Defendants argue that the undisputed evidence in the record indicates that Bertie and the Lipscombs acted with, at worst, negligence regarding allegedly false claims. Mem. Summ. J. [DE-26] at 22.

### 1. The Lipscombs' Individual Liability

With regard to the Lipscombs individually, Defendants contend that the evidence reflects a lack of involvement with the day-to-day management of the business. *Id.* at 17–19. Rather than directing decisions regarding medical necessity, the Lipscombs delegated that responsibility to trusted upper-level employees; the Lipscombs only learned of such decisions after the fact, and believed them to have been made properly. *Id.* at 17. Thus, Defendants argue, the record fails to implicate the Lipscombs individually in any improperly submitted claims. *Id.*

The Government points to excerpts from several depositions and affidavits that purportedly create at least a genuine dispute of material fact as to the Lipscombs' knowledge of allegedly false claims. *See* Resp. [DE-31] at 17–18. Far from pointing to liability, however, these excerpts either

6

tend to exonerate the Lipscombs or fail to mention them at all. Edward and Annetta Lipscomb's deposition testimony consistently indicated that neither of them were involved in the day-to-day operations of Bertie, or in decisions related to medical necessity. *See* Gov't Ex. G, Dep. E. Lipscomb [DE-31-8] at 15, 25–26, 32–33, 43–45, 50, 77–82; Gov't Ex. H, Dep. A. Lipscomb [DE-31-9] at 25–28, 35–36, 38–41. Although each of the Lipscombs had heard of missing documentation or transports without medical necessity, they believed that such instances were rare and were investigated and corrected properly by their management staff. *See* Dep. E. Lipscomb [DE-31-8] at 81, 93, 96–97, 99; Dep. A. Lipscomb [DE-31-9] at 15–16, 39–41. Although the Government points to declarations and affidavits by various employees and former employees of Bertie, these employees largely fail to contest the Lipscombs' statements. The affidavits of Lorrie Williams, Crystal White, and Lou Joyner-Byrum, while damning for Bertie, fail to mention the Lipscombs at all. *See* Gov't Ex. B, Decl. L. Williams [DE-31-3]; Gov't Ex. L, Decl. C. White [DE-31-16]; Gov't Ex. M, Decl. L. Joyner-Byrum [DE-31-17].

The only statement cited by the Government that could be construed as inculpating the Lipscombs is found in the affidavit of Robert Byrum, a former Bertie employee. The Government relies on a truncated quote from Byrum's affidavit—"owners Edward and Annetta Lipscomb were aware that [Bertie] transported patients by ambulance who did not meet the medical billing criteria from the time periods when they were more involved in the day-to-day operations of [Bertie]." Resp. [DE-31] at 17. Unedited, Byrum's statement packs less of a punch:

> [Bertie] Manager Hughes was supposed to report information about ineligible patients up the management chain and someone was supposed to investigate these concerns, but nothing further was heard and the patients would continue to be transported by ambulance. I believe [Bertie] owners Edward and Annetta Lipscomb were aware that [Bertie] transported patients by ambulance who did not meet the medical billing criteria from the time periods when they were more involved in the day-to-day operations of [Bertie]. These problems of transporting ineligible patients and incomplete documentation continued throughout my years working at [Bertie].

7

Gov't Ex. A., Aff. R. Byrum [DE-31-2] ¶ 9. Taken in context, Byrum's statement certainly accuses Bertie, but contains nothing more than an unsupported opinion as to the Lipscombs' knowledge of alleged improprieties. This single allegation, standing alone, is insufficient to create a genuine dispute of material fact.

The FCA is not a strict liability statute. It does not punish high-ranking individuals merely because of their association with a wrongdoing corporation. *See United States ex rel. Landis v. Tailwind Sports Corp.*, 51 F. Supp. 3d 9, 52 (D.D.C. 2014). Instead, the Government is charged with proving the requisite scienter for each individual defendant. On the record before the court, a reasonable jury could not conclude that the Lipscombs had actual knowledge of, deliberate ignorance of, or reckless disregard for the truth or falsity of claims submitted to the Government by Bertie.

### 2. Bertie's Liability

Defendants point to depositions indicating that Bertie "exceeded requirements in its efforts to comply with the law" by conducting internal reviews, investigating suspicious transports, and retaining EMS Management to "provide[ ] another layer of review for the documentation as well as provide[ ] additional compliance training for [Bertie] staff." Mem. Summ. J. [DE-26] at 22. Further, Defendants argue that the record is bereft of evidence that ambulance transports without medical necessity were ever reported to Bertie managers, who therefore "could not have knowingly provided improper transport." *Id.* at 23. The Government, however, presents affidavits and declarations indicating that EMTs regularly reported to Bertie management the existence of patients who did not meet medical necessity, but the ineligible patients continued to be transported. *See* Aff. R. Byrum [DE-31-2] ¶ 8; Decl. C. White [DE-31-16] ¶ 7; Decl. L. Joyner-Byrum [DE-31-17] ¶ 4. Employees and former employees of Bertie report that they were instructed by management to complete their reports in certain ways to give improper ambulance transports the appearance of legitimacy. *See* Aff.

8

R. Byrum [DE-31-2] ¶¶ 5–6; Decl. C. White [DE-31-16] ¶ 5; Decl. L. Joyner-Byrum [DE-31-17] ¶ 6. If the Government's evidence is believed, a jury could reasonably conclude that Bertie acted with at least reckless disregard for the veracity of its claims. Thus, the Government's evidence creates at least a genuine dispute of material fact.

### B. *Statute of Limitations for Claims Against Bertie*

The parties appear to agree that the Government's claims against all defendants are subject to a six-year statute of limitations under the FCA. *See* Mem. Summ. J. [DE-26] at 14; Def. Ex. A, Fowler Letter [DE-27-1]. Any claim brought more than six years after the alleged violation occurred will be time-barred, unless tolled. *See* 31 U.S.C. § 3731(b).

Here, Bertie entered into a series of tolling agreements with the Government, in which Bertie agreed to waive its statute of limitations defense. 2010 Tolling Agreement [DE-27-2]; 2011 Tolling Agreement [DE-27-3]; 2012 Tolling Agreement [DE-27-4]; 2013 Tolling Agreement [DE-27-5]. The sole consideration for Bertie's waiver was the Government's promise to provide thirty days' notice prior to filing suit against Bertie. 2010 Tolling Agreement [DE-27-2]; 2011 Tolling Agreement [DE-27-3]; 2012 Tolling Agreement [DE-27-4]; 2013 Tolling Agreement [DE-27-5]. Bertie asserts that the Government breached the tolling agreements by failing to provide the agreed upon notice. Mem. Summ. J. [DE-26] at 19–20. Therefore, Bertie argues, the tolling agreements are unenforceable, and Bertie is entitled to summary judgment on all claims time-barred by the statute of limitations. *Id.* at 20. As the Complaint [DE-1] in this case was filed on August 28, 2014, this would include all claims arising prior to August 28, 2008.

The parties agree as to both the validity of their contract and its terms. *See* Resp. [DE-30] at 13; Mem. Summ. J. [DE-26] at 19. The Government, however, contends that it provided thirty days' notice of its intent to file suit as required by the tolling agreements. Resp. [DE-30] at 12. The issue,

9

therefore, turns on whether the tolling agreements between Bertie and the Government are enforceable.

A tolling agreement is a contract. *See, e.g.*, *Pension Benefit Guar. Corp. v. Uforma/Shelby Bus. Forms, Inc.*, No. 1:13-CV-266, 2014 WL 221941, at *6 (S.D. Ohio Jan. 21, 2014), *Delano v. Abbott Labs.*, 908 F. Supp. 2d 888, 895 (W.D. Tenn. 2012). The court, therefore, looks to state law contract principles governing the interpretation of contracts and remedies for their breach. A breach of contract requires: (1) the existence of a valid contract, and (2) a breach of its terms. *One Beacon Ins. Co. v. United Mech. Corp.* 700 S.E.2d 121, 124 (N.C. Ct. App. 2010). A party's failure to perform or comply with the terms of a contract constitutes breach. *See Sechrest v. Forest Furniture Co.*, 141 S.E.2d 292, 293–94 (N.C. 1965). "[W]here there is a material breach of the contract going to the very heart of the instrument, the other party to the contract may elect to rescind." *Wilson v. Wilson*, 134 S.E.2d 240, 242 (N.C. 1964). This is because "[a] breach of such a covenant amounts to a breach of the entire contract." *Id.* (quoting *Steak House, Inc. v. Barnett*, 65 So.2d 736, 738 (Fla. 1953)). The effect of a rescission is "the entire abrogation and undoing of the contract from the beginning." *Lumsden v. Lawing*, 421 S.E.2d 594, 599 (N.C. Ct. App. 1992). The parties are placed in the position they would have been had a contract never been formed. It is as if the original contract never existed.

The Government's assertion that it provided notice hinges on an email and a phone call to defense counsel. On July 16, 2014, counsel for the Government emailed defense counsel, stating that the Government was "now preparing to move forward in this case," that "it may be helpful to schedule a phone call in the next week to discuss our next steps," and that "[w]e appreciate your cooperation as we pursue or seek to resolve this civil action." Gov't Ex. K-3, Fowler Email [DE-31-15]. In a phone call to defense counsel, Government counsel stated that he "had a complaint prepared

10

for filing." Gov't Ex. K, Decl. N. Fowler [DE-31-12] ¶ 9. Based on these two statements, and the Government's failure to seek a fifth tolling agreement, "Government counsel believed that it was clear from both the express communication and the circumstances that the United States intended to file a complaint before the expiration of the fourth Tolling Agreement on August 29, 2014, unless the parties could reach a realistic settlement, and that a complaint could be filed at the expiration of the Tolling Agreement." Resp. [DE-31] at 19.

The court finds that the Government's vague statements to defense counsel fall short of what could reasonably be considered notice of intent to file suit. There is nothing definitive about any of the Government's statements. In fact, after years of settlement discussions between the parties, statements that the Government is "preparing to move forward" or that it "has a complaint prepared" sound like an attempt at a hard-line negotiation, not notification of a concrete fact. The Government had one duty under its contract with Bertie—to provide thirty days' notice prior to filing suit. In exchange, Bertie waived an extraordinary protection. The Government's failure to provide the notice it had promised amounts to a breach of its contract with Bertie—a breach that goes to the very heart of the agreement, entitling Bertie to rescission. Accordingly, this court declines to enforce the tolling agreements between the Government and Bertie.[1] All claims against Bertie arising prior to August 28, 2008, therefore, are time-barred.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment [DE-25] is ALLOWED in part and DENIED in part. The Government's conspiracy claims are DISMISSED.

---

[1] Alternatively, the Government argues that, even if it has breached its contract with Bertie, equitable estoppel should prevent Bertie from receiving the benefit of the delay in filing while depriving the Government of the Tolling Agreements' benefits. Resp. [DE-31] at 12. It is unclear how, or if, Bertie benefitted from the Government's delay in filing. What is clear is that the delay is not the benefit for which Bertie bargained. Regardless, this court declines to apply an equitable doctrine in favor of the breaching party. *See Creech v. Melnik*, 495 S.E.2d 907, 913 (N.C. 1998) ("One who seeks equity must do equity.").

All claims against Edward L. Lipscomb and Annetta P. Lipscomb are DISMISSED. Further, all claims against Bertie arising prior to August 28, 2008 are DISMISSED. Trial is scheduled to begin on the remaining claims during this court's November 2, 2015 term.

SO ORDERED.

This the _8_ day of October, 2015.

_James C. Fox_

JAMES C. FOX
Senior United States District Judge